UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES MICHAEL DAVIS,

    Plaintiff,

v.                                  CASE NO. 6:19-CV-1989-Orl-MAP

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

## ORDER

This is an appeal of the administrative denial of disability insurance benefits (DIB) and period of disability benefits.[1] *See* 42 U.S.C. § 405(g). Plaintiff, who suffers from PTSD, depression, and back and lung impairments, argues the administrative law judge (ALJ) did not properly weigh the medical opinions. After considering the parties' arguments and the administrative record (docs. 11, 17), I find the Commissioner's decision is not supported by substantial evidence. I remand.

    *A.    Background*

Plaintiff James Davis was born on July 7, 1969, and was 47 years old on his alleged onset date of February 24, 2017. (R. 26) He alleges disabling PTSD, depression, asthma, lung impairments, degenerative disc disease, and neuropathy. Plaintiff's date of last insured (DIB) is December 31, 2018; he must show he became disabled by this date to receive benefits. (R. 21)

Plaintiff enlisted in the United States Air Force after high school. During his 22 years in the military (1989-2011), he served in the Gulf War and was stationed at numerous air bases abroad

---

[1] The parties have consented to my jurisdiction. *See* 28 U.S.C. § 636(c).

and in the United States. (R. 58)  To obtain officer status, Plaintiff studied in his off time for his undergraduate degree in business administration at Troy State University. (R. 54) He graduated in 1999, then obtained master's degrees in public administration and military service in 2003. (R. 767) His military occupational specialty (MOS) was as a mortuary officer. (R. 58)  He retired in 2011 with an honorable discharge.

Plaintiff's PTSD stems from his experiences in the military.  He has a VA disability rating of 100% associated with his service-connected PTSD. (R. 568)  He described his duties at the hearing:

> If there was an accident, aircraft accident I would actually go out there, document the scene, recover the victims in whatever state or whatever pieces, and then I would follow that all the way until it went into the ground.  So, that means notifying the next of kin, talking to their kids, helping people at mortuary offices that don't know what they're doing, if I've got to do the embalming myself, that type things.

(R. 59)  He kept count of the number of bodies he handled: 5,174.  After retirement he began having nightmares of these bodies haunting him. (R. 267)  He wakes up screaming and sweating. He sleeps very little and, consequently, cannot concentrate during the day for lack of sleep.  He has anxiety attacks (he testified to 40 over a 6-month period) made worse by "people asking dumb questions." (R. 264-65)  He feels he does not fit in: "I catch myself talking about dead bodies if I get around anyone and it makes them uncomfortable." (R. 273)  Plaintiff "was the life of the party" before he retired but now feels like "a tired, sleepy hermit." (R. 268)  He does not think a psychiatrist or group therapy with other veterans would help him.  He testified:  "I tried to go once. But, like I said, there is no one common like me.  Unless you were a coroner or a medical examiner, you don't see 5,000 dead bodies." (R. 69)

For treatment, Plaintiff self-medicated with alcohol for years before his onset date.  He testified he almost stabbed a stranger for no reason when he was drunk at a country music concert.

(R. 66) He stopped drinking after that, but sobriety did not lessen his volatile outbursts, usually triggered by perceived injustices. (R. 67) He assaulted his brother-in-law "for running his mouth" at his mother-in-law's 90th birthday party (R. 65), and he testified to multiple road rage incidents where he chased down drivers in his car for not following traffic rules and pounded on their windows in outrage. (R. 64-65)

Plaintiff states he "can't function while [he's] doing all [he] can not to get stupid on someone." (R. 266) His temper and his drinking ended his relationships with his wife and daughter: "They don't understand me. I scare them, so I don't stay overnight with anyone. Haven't seen my wife in over 2 years. . . . Conversation is hard so I just don't call." (R. 272) Now sober, he rents a room from a friend, a former military chaplain whose insights on Plaintiff's personality and daily activities are in the record. (R. 235, 267) Long resistant to psychiatric treatment or group therapy at the VA, he sees a private psychologist monthly for his PTSD. (R. 69-72) He does not take any psychotropic medications and does not want to. (*Id*.) To alleviate his symptoms, he retreats into his room for long stretches, spends days alone at his storage unit, or camps alone in the woods in his RV. (R. 235, 265)

After a hearing, the ALJ found that Plaintiff had not performed substantial gainful activity between February 24, 2017 (his alleged onset date), and December 31, 2018 (his date last insured for DIB purposes). The ALJ identified Plaintiff's severe impairments as "obesity; hypertension; post-traumatic stress disorder; depressive disorder; degenerative disc disease of the cervical spine; asthma; reactive airway disease; and polyneuropathy." (R. 22) Despite these impairments, the ALJ found Plaintiff is not disabled because he maintains the residual functional capacity (RFC) to perform a limited range of light work:

> [C]laimant is able to occasionally lift and/or carry twenty pounds and ten pounds frequently; stand and/or walk for a total of six hours in an eight hour workday; push

>and/or pull as shown for lift and/or carry; occasionally climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. The claimant is able to have superficial and infrequent contact with coworkers and the public. He is able to perform simple, routine tasks.

(R. 25) In a May 21, 2019, decision, the ALJ found that, with this RFC, Plaintiff could not perform his past work but could work as a mail sorter, garment sorter, or shipping/receiving weigher. (R. 41) Plaintiff appealed the ALJ's decision to the Appeals Council (AC), which denied review. (R. 2) His administrative remedies exhausted, Plaintiff filed this action.

  B.  *Standard of Review*

To be entitled to DIB, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. § 423(d)(3).

The Social Security Administration, to regularize the adjudicative process, promulgated detailed regulations. These regulations establish a "sequential evaluation process" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits his ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part

404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform his past relevant work; and (5) if the claimant cannot perform the tasks required of his prior work, the ALJ must decide if the claimant can do other work in the national economy in view of his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

C.   Discussion

1.   Weight of medical opinions

Plaintiff argues that the ALJ improperly discounted the opinions of his treating psychologist and consultative psychologist in favor of those of a non-examining doctor (doc. 17 at 13).[2] The Commissioner responds that substantial evidence – most notably Plaintiff's refusal

---

[2] Because I find the ALJ did not properly weigh the medical evidence, this Order does not address Plaintiff's argument – contained in one paragraph within his section of the joint brief challenging

5

to seek treatment, either through medication or psychotherapy – supports the ALJ's position (*Id.* at 21).

The method for weighing medical opinions under the Social Security Act is in the regulations at 20 C.F.R. § 404.1527(c).[3] Relevant here, the opinions of examining physicians are generally given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. § 404.1527(c)(1-5). A court must give a treating physician's opinions substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted).

This rule – the "treating physician rule" – reflects the regulations, which recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment." 20 C.F.R. § 404.1527(c)(2). With good cause, an ALJ may disregard a treating physician's opinion but "must clearly articulate the reasons for doing so." *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). And the ALJ must state the weight given to different medical opinions and why. *Id.* Otherwise, "it is impossible for a reviewing court to determine

---

the weight the ALJ assigned the medical opinions – that the ALJ's RFC analysis should have addressed Plaintiff's limitations on his ability to reach (doc. 17 at 14).

[3] This section was rescinded on March 27, 2017, but still applies to claims filed before this date. Plaintiff filed his claim on March 8, 2017 (R. 19). For claims filed after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

The ALJ considers many factors when weighing a medical opinion. *See* 20 C.F.R. § 404.1527(c). For instance, the Social Security regulations command that the ALJ consider (1) the examining relationship; (2) the treatment relationship, including the length and nature of the treatment relationship; (3) whether the medical opinion is amply supported by relevant evidence; (4) whether an opinion is consistent with the record as a whole; and (5) the doctor's specialization. *Id*. Non-examining physicians' opinions are entitled to little weight when they contradict the opinions of examining physicians and do not alone constitute substantial evidence. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1260 (11th Cir. 2019).

Jeffrey Williamson, Ph.D. is a licensed psychologist who treated Plaintiff approximately 17 times from December 2016 (when Dr. Williamson first evaluated him through the Veterans Evaluation Services program), through March 2019.[4] (R. 1199-1205, 1255-72) He completed a psychological evaluation of Plaintiff in August 2018, after treating Plaintiff once a month for nine months. (R. 1199) Dr. Williamson noted Plaintiff had problems with his short-term memory and experienced intrusive flashbacks, but his insight was good and his social judgment was fair. (R. 1257) He diagnosed Plaintiff with chronic and severe PTSD and major depression related to his military service (Plaintiff also has a VA disability rating of 100% due to PTSD). (*Id*.) Dr. Williamson summarized Plaintiff's duties as a mortuary affairs officer:

---

[4] The ALJ's decision states that Plaintiff treated with Dr. Williamson 13 times (doc. 17 at 3; R. 33). My review of the record shows Plaintiff met with Dr. Williamson 17 times (usually for 60-minute sessions), excluding his initial evaluation in December 2016. These appointments were on April 3, 2017; October 24, 2017; November 20, 2017; December 18, 2017; January 4, 2018; February 6, 2018; March 6, 2018; April 3, 2018; May 22, 2018; June 26, 2018; August 3, 2018 (when Dr. Williamson also authored his report); September 5, 2018; October 4, 2018; November 5, 2018; January 8, 2019; February 19, 2019; and March 5, 2019. (R. 1256-272).

7

> Mr. Davis was responsible for the processing and burial of deceased soldiers and associated personnel and directly experienced 5174 deaths ranging from being a responder to the scene of death and collecting body parts, piecing the bodies together into some resemblance of a whole body, embalming and all other associated tasks involved with the burial of deceased human beings. Besides his direct involvement with human remains, Mr. Davis was also the point of contact for family members who were in severe grief and anguish which too often was experienced and directed towards the veteran. Of note, after the death of the serviceman, Mr. Davis was required to write a personalized letter to a designated family member or next of kin on the one year anniversary of the death of the serviceman.

(R. 1256-57) Dr. Williamson opined this job took a severe toll on Plaintiff over time. Plaintiff "experiences considerable emotional distress," and "significant symptoms of [PTSD] which include intrusive memories regarding traumatic events (e.g., service related), nightmares or dreams and has periods of dissociation which lead to aggressive interactions with others." (R. 1257) The psychologist continued: "[Plaintiff] is overly sensitive to interpersonal slights or insult and may overreact to perceptions of danger or threat" with anger. (*Id*.) He exhibits "significant physiological symptoms of anxiety and inner turmoil, and, cognitively, brooding and rumination is indicated" which result in "episodes of intense dissociation marked by depression, irritability and anger[.]" (R. 1258) And Plaintiff has "a number of threat-override symptoms where he perceives potential danger in neutral events or overreacts with anger towards the source of the perceived threat." (*Id*.)

Dr. Williamson completed a mental RFC form at the same time as his report, opining Plaintiff had mild limitations in his ability to understand and remember simple instructions, and moderate limitations when trying to carry out simple instructions and make simple work-related decisions. (R. 1202) He was markedly limited in: understanding, remembering, and carrying out complex instructions; remembering locations and work-like procedures; making complex work-related decisions; maintaining regular attendance and punctuality; maintaining socially appropriate

behavior; and responding to usual work situations and changes in a routine work setting. (R. 1202, 1204) Dr. Williamson opined Plaintiff is extremely limited in his ability to maintain concentration for an extended period of time; work close to others without being distracted; interact appropriately with the public, supervisors, and coworkers; and ask questions or seek assistance. (*Id*.) In the end, Dr. Williamson opined these limitations render Plaintiff unable to work. (R. 1205)

The ALJ assigned little weight to Dr. Williamson's opinion. (R. 37) The ALJ stated: "Although the claimant asserted that he had not missed any monthly sessions with Dr. Williamson, as noted herein, the record evidences gaps in his sessions. The claimant's first session was only approximately four days after he engaged his attorney representative." (R. 38) The ALJ continued: "Moreover, this opinion is not generally consistent with the overall record. Mr. Williamson himself reported mental status examination findings and observations that included that the claimant was cooperative; made good eye contact; exhibited adequate grooming and hygiene; and that his concentration and task persistence were adequate." (*Id*.)

Good cause does not support the ALJ's decision to discount Dr. Williamson's opinion. First, the ALJ points to what she characterizes as inconsistencies between Dr. Williamson's mental RFC and his treatment notes, yet elsewhere in her decision she states his treatment notes are "generally consistent" with his report. (R. 33, 38) Second, the ALJ emphasizes Plaintiff "was not seen for any treatment between December 2016 and October 2017." (R. 33) Some of this time period is prior to Plaintiff's alleged onset date of February 24, 2017. Also, the ALJ is incorrect: Plaintiff also saw Dr. Williamson on April 3, 2017. (R. 1259) While there was a treatment gap between April 3, 2017, and October 24, 2017, this is a six-month gap rather than 11 months. The ALJ calculated Plaintiff "had a total of approximately thirteen sessions" with Dr. Williamson, but she overlooks appointments Dr. Williamson reported in January, February, April, and June 2018,

9

which brings the number of sessions to 17. (R. 33, 1199)  Overall, this weakens the ALJ's finding that "the overall record did not evidence consistent mental health treatment through medication management and/or psychiatry or mental health counseling[.]" (R. 37)

Third, in discounting Dr. Williamson's opinion as inconsistent with the rest of the medical record, the ALJ appears to rely on the September 15, 2017, consultative psychological evaluation of Susan Sullivan, Ph.D. (R. 38)  The ALJ stated: "Dr. Sullivan noted the claimant's memory was intact, his reasoning was intact, and his thought process was coherent." (*Id.*)  Dr. Sullivan, however, was a one-time examiner – not a treating source – who authored her opinion about a year before Dr. Williamson's August 2018, report.  *See Crawford v. Comm'r of Soc Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam) (one-time examiners are not properly considered treating physicians).  And, earlier in the ALJ's decision, she assigned Dr. Sullivan's evaluation little weight because it does "not provide a specific, function by function assessment of the claimant's ability to perform work related tasks." (R. 36)

In fact, the only opinion regarding Plaintiff's mental impairments the ALJ credits is that of Todd Giardina, Ph.D., a non-examining state agency doctor who opined at the reconsideration level that Plaintiff has no limitations in understanding and memory; is able to sustain concentration, persistence, and pace for routine work; is able to relate one-to-one in a non-customer contact role; and can adapt to routine work. (R. 34-35, 119-20)  Dr. Giardina, in turn, considered the November 7, 2017, psychological evaluation completed by Scott Kaplan, Psy.D. (R. 114)  Dr. Kaplan, a one-time consultative examiner like Dr. Sullivan, concluded Plaintiff's high levels of anxiety and depression make it likely he will experience significant decompensation in a work setting. (R. 770)  He opined Plaintiff is incapable of work.  Ironically, Dr. Giardina characterizes Dr. Kaplan's opinion as "by a non-treating source" and unsupported by the evidence. (R. 121)

The ALJ assigned Dr. Giardina's conclusions great weight, stating "Dr. Giardina is familiar with disability rules and definitions. He had the opportunity to review the then existing medical record. He did not examine the claimant; however, his opinion is generally consistent with the overall record." (R. 35) Dr. Giardina's opinion is dated April 13, 2018 (R. 120); he did not have access to Dr. Williamson's August 2018 report (which corroborates Dr. Kaplan's) in forming his opinion, because it did not exist then. Interestingly, in assigning great weight to Dr. Giardina's findings, the ALJ cites to Drs. Williamson and Sullivan, whose opinions she discounted, and to Dr. Kaplan, whose opinion the ALJ proceeds to assign little weight as "a one-time evaluation. . . . not completely consistent with the overall record." (R. 35, 37)

Compare this with the ALJ's consideration of the opinions of state agency consultants Pauline Hightower, Psy.D., and Cal VanderPlate, Ph.D. (R. 104, 757) The ALJ assigned these opinions no weight, also citing Dr. Williamson. (R. 34) Drs. Hightower and VanderPlate each found that Plaintiff had no limitations in understanding, remembering, or applying information; mild limitations in interacting with others; no limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself. The ALJ stated:

> As State agency consultants, Drs. Hightower and VanderPlate have program knowledge and had the opportunity to review the then existing record  However, they did not examine the claimant. Moreover, these opinions are not generally consistent with the overall record. For example, Dr. Williamson noted the claimant was isolative and socially disengaged; that he evidenced occasional aggressive threat and/or intimidation; and that he demonstrated emotional volatility and detachment.

(R. 34)

The ALJ discounts most of the record opinions on Plaintiff's mental impairments yet relies on these same opinions in assigning great weight to Dr. Giardina's assessment. This adds up to a confusing analysis – "with no explanation given and no obvious reason for the inconsistency in

sight – [which] makes it impossible for [the Court] to consider this rationale good cause." *Schink*, 935 F.3d at 1261 (rejecting ALJ's decision to discount treating physicians' opinion that plaintiff's bipolar disorder was disabling in favor of consultative and non-examining source opinions, based on treating physicians' "perceived sporadic treatment"; the treating sources "administered significant treatment multiple times over months" and the non-treating sources either saw the plaintiff once or not at all); *see also Spencer by Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) (per curiam) (rejecting the ALJ's inconsistent reliance on one source's opinion to undermine that of a treating physician when the ALJ rejected the first source's opinion about other important matters on unexplained grounds); *but see Ross v. Comm'r of Soc. Sec.*, 794 F. App'x 858, 866 n.10 (11th Cir. 2019) (in DIB appeal involving veteran's alleging disabling PTSD, distinguishing *Schick* and upholding ALJ's decision to discount treating psychologist's opinion in favor of other evidence, because the ALJ highlighted "several genuine inconsistencies" between treating physician's treatment notes and her testimony, and plaintiff's daily activities were inconsistent with disabling PTSD).

The ALJ also emphasizes that Plaintiff is not taking any psychotropic medications, is not seeing a psychiatrist, and has refused mental health treatment through the VA. (R. 37) Plaintiff explained that he is leery of VA mental health options so instead he sees Dr. Williamson for therapy. (R. 69-72) Plaintiff's conservative treatment is a factor the ALJ may consider in weighing the medical evidence; however, considering the errors mentioned above, this factor standing alone does not constitute substantial evidence.

*D.     Conclusion*

For the reasons stated above, it is ORDERED:

(1) The ALJ's decision is REVERSED and REMANDED for further consideration of the medical opinions; and

(2) The Clerk of Court is directed to enter judgment for Plaintiff and close the case.

DONE and ORDERED in Tampa, Florida on September 11, 2020.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE